IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:19-CV-533-FL

| | | |
|---|---|---|
| KATHRYN D. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| MERRICK GARLAND, Attorney General of the United States, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on defendant's motion for summary judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure. (DE 45). Issues raised are ripe for ruling. For the following reasons, the motion is granted.

## STATEMENT OF THE CASE

Plaintiff, a former special agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") in its Raleigh field office, initiated this action against defendant, November 22, 2019, claiming she was unlawfully terminated on the basis of her sex, and in retaliation for complaining of sex discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"). Plaintiff seeks compensatory and pecuniary damages, injunctive relief, attorneys' fees, and costs.

Following a period of discovery,[1] defendant filed the instant motion for summary judgment with reliance upon: 1) declarations of ATF employees, Timothy Sloan ("Sloan"), Yvette Young

---

[1] Defendant initially filed a motion for summary judgment in lieu of an answer, based on the record developed during administrative adjudication of plaintiff's Equal Employment and Opportunity Commission ("EEO") complaint. On October 29, 2020, the court denied defendant's motion as premature.

("Young"); Ernesto Diaz ("Diaz"); and Christopher Hyman ("Hyman"); 2) deposition testimony of plaintiff and Sloan; 3) affidavits of plaintiff, Sloan, and additional ATF employees: James Avant ("Avant"), Stephen Babits ("Babits"), and Tanisha Jeter ("Jeter"); 4) correspondence and notes of Sloan, Hyman, and Diaz; 5) ATF programs and policies; 6) evaluations and notice of termination of plaintiff; and 7) EEO materials.

In her opposition, plaintiff makes reference to Sloan's deposition and plaintiff's formal EEO complaint and deposition, as well as: 1) the deposition testimony of Avant, Babits, and additional ATF employee, Michael Chamberlain ("Chamberlain"), and 2) an additional evaluation of plaintiff.

## STATEMENT OF THE FACTS

The undisputed facts, viewed in the light most favorable to plaintiff, may be summarized as follows.[2]  Plaintiff was employed by ATF as a special agent in its Raleigh field office between November 15, 2015, and July 27, 2017.   (Pl. Dep. (DE 61-2) 8:15-20).  She graduated from the ATF Academy roughly midway through that time, on June 2, 2016.  (Id. 8:21-22).   Upon graduating, "[p]laintiff's first-level supervisor was [Sloan]; her second-level supervisor was [Diaz]; and her third-level supervisor was [Hyman]."  (Def. Stmt. (DE 47) ¶ 2).[3]  "Plaintiff was also assigned to two [instructors], also known as training agents, while in the Raleigh [f]ield [o]ffice: [Avant] from June 9, 2016 to April 1, 2017, and [Babits] from approximately April 1,

_____

[2]      Pursuant to Local Rule 56.1(a)(2), the court cites to paragraphs in the parties' statements of facts, or portions of such paragraphs, where not "specifically controverted by a correspondingly numbered paragraph in the opposing statement."

[3]      Where possible, the court cites testimony by transcript page and line number.  Otherwise, page citations are to the page numbers assigned by the court's case management and electronic case filing system ("CM/ECF").

2

2017 to July 26, 2017." (Id. ¶ 3). Avant and Babits "functioned as mentors and role models to [p]laintiff as she began her career at ATF." (Id.).

Prior to graduation from the academy, "[o]n May 17, 2016, [] Sloan emailed the Raleigh [f]ield [o]ffice, including [p]laintiff, . . . regarding the new ATF Dress Code Policy." (Id. ¶ 4).

In the May 17, 2016 email, [] Sloan wrote that "business attire is appropriate for Headquarters employees and for field employees when they are spending the workday in the office. Business attire includes suits, pants, jackets, shirts, skirts and dresses that are appropriate for a business environment." [] Sloan stated that special agents were required to "dress appropriately for the assignment/activity" but "jeans (regardless of color and/or pattern), t-shirts, sweat suits, shirts without collars, and footwear such as flip flops and sneakers are not appropriate in the office."

(Id. ¶ 5).

In reiteration of that email's contents, "[o]n January 20, 2017, [] Sloan emailed the Raleigh [f]ield [o]ffice, including [p]laintiff, regarding case reviews and ended the email with: FYI [Hyman] and [Diaz] will be in the Office a couple days next week so please dress appropriately. No T Shirts and No sneakers." (Id. ¶ 7). The following week, "[o]n January 26, 2017, [p]laintiff wore sneakers and a t-shirt to the office." (Id. ¶ 8). "Sloan told her not to dress that way the following day because [] Hyman and [] Diaz were going to be in the office," and on January 27, 2017, "[p]laintiff wore boots and a button up shirt." (Id. ¶¶ 8-9).

Three days later, "[o]n January 30, 2017, [p]laintiff and her husband, who was also an ATF special agent, wore sneakers to a training at the Charlotte Field Division where [] Hyman was present, and [] Sloan tried to talk to [p]laintiff and her husband about their attire." (Id. ¶ 10). "According to [p]laintiff, she and her husband 'blew the comment off and did not respond to [] Sloan's comment.'" (Id.).

3

The following day, "[p]laintiff wore sneakers and a t-shirt to the Raleigh [f]ield [o]ffice, and when she walked into [] Sloan's office to ask a work-related question, he walked out from behind his desk to look at her shoes and made another comment about her sneakers." (Id. ¶ 11). Plaintiff "closed the door to his office and told him she was pregnant," and Sloan told plaintiff "he would make an exception for her and allow her to wear sneakers." (Id. ¶ 13). According to plaintiff, she complained that she "didn't want his exception. [She] wanted to be treated like everybody else in the office was treated and, you know, they're wearing tennis shoes." (Pl. Dep. (DE 61-2) 21:13-17).

"During a March 2, 2017, case review between [] Sloan, [] Avant, and [p]laintiff, [p]laintiff mentioned that she would be meeting with an Assistant United States Attorney that day, and she was dressed in faded jeans, sneakers, and a hooded sweatshirt." (Def. Stmt. (DE 47) ¶ 18). Sloan and Avant both "asked [p]laintiff to dress more professionally in professional settings." (Id. ¶ 19). Plaintiff alleges Sloan "never specifically addressed going to the U.S. Attorney's office" before March 2, 2017, and she never thereafter wore jeans or a hooded sweatshirt to the U.S. Attorney's office. (Pl. Dep. (DE 61-2) 46:7-13).

"Around March 2017, [] Sloan told [p]laintiff that [] Diaz informed him that [p]laintiff had participated in an ATF operation while wearing jeans, rather than her ATF-issued Battle Dress Uniform." (Def. Stmt. (DE 47) ¶ 15). "Plaintiff responded to [] Sloan's comment and said that she wore jeans because her Battle Dress Uniform pants no longer fit due to her pregnancy." (Id. ¶ 16). "Sloan told Plaintiff that she could order new pants that fit and he would approve the purchase." (Id. ¶ 17).

4

"On March 24, 2017, [] Diaz asked [p]laintiff to meet with him because he had met with all other agents except for her." (Id. ¶ 20). "When [p]laintiff arrived at the meeting . . . she discovered that [] Sloan was there and asked [] Diaz if he could make [] Sloan leave so that she could talk with [] Diaz alone." (Id. ¶ 21). Diaz agreed to meet with plaintiff privately, but told her that "first, he and [] Sloan needed to talk with her about some issues." (Id. ¶ 22). The meeting proceeded, during which "Sloan was critical of [p]laintiff's performance and told her that she needed to improve her work and take the necessary steps to grow as an agent." (Id. ¶ 23). "Some of the problems with [p]laintiff's work that [] Sloan cited in the meeting . . . included her failure to turn in eight reports of investigation on time, her failure to update her cases on time, and transporting a prisoner with her husband without getting prior approval." (Id. ¶ 24).

"Plaintiff was disappointed with [] Diaz because he 'seemed to agree with what [] Sloan was saying.'" (Id. ¶ 25). Once Sloan "finished giving his feedback. . . [p]laintiff requested that he leave so that she could talk to [] Diaz alone." (Id. ¶ 26). "Diaz agreed, after which [p]laintiff privately complained to [him] that she felt like [] Sloan was 'trying to target [her] to get [her] fired.'" (Id.). "Diaz assured [p]laintiff that [] Sloan was not trying to get her fired and [] Sloan had her best interests at heart; but [p]laintiff walked away dissatisfied because she felt like [] Diaz was not interested in hearing her complaints." (Id. ¶ 27).

Plaintiff was transferred from training agent Avant to Babits April 1, 2017, and on April 12, 2017, Babits and Hyman met with plaintiff "in order to discuss her performance and [] Hyman's expectations of her." (Id. ¶ 28). Plaintiff informed Babits and Hyman that she wanted to use the . . . meeting to share complaints about [] Sloan, but [] Hyman said he would do most of the talking and instead wanted to discuss issues with [p]laintiff's performance." (Id. ¶ 29).

5

Plaintiff alleges Hyman then told her he expected her "to be the first one in the office and the last to leave the office . . . and be volunteering for everything."  (Id. ¶ 30).

April 23, 2017, Sloan emailed Diaz plaintiff's second quarter evaluation, writing:

> I've been slow to send this, probably because it was difficult to write, so I can only imagine how hard it will be for [plaintiff] to read.
>
> I stand by every word and feel it is very important to document accurately all the deficiencies of the last quarter just in case we have future problems. I will stress to her that this is all in the past and though we cannot change the past we can certainly change the future. If things turn around this will all be a distant memory.

(Id. ¶ 31).  That evaluation "covered the time period from January 1, 2017, through March 31, 2017."  (Id. ¶ 32).  Plaintiff received it April 25, 2017.  (Id.).

In the second quarter evaluation, Sloan rated plaintiff as "'Unacceptable' in the five critical performance elements of 'Self-Management,' 'Teamwork,' 'Professionalism,' 'Initiative,' and 'Judgment.'"  (Id. ¶ 33).  In explanation, he reported:

1. "[D]espite being advised several times by [himself] and [] Avant to consult with [] Sloan and ask for assistance when needed, there was virtually no communication between [] Sloan and [p]laintiff unless it was initiated by [] Sloan," (id. ¶ 34);[4]

2. "Plaintiff disregarded the need to stay in communication with fellow agents," (id. ¶ 35);

3. "[Plaintiff's] coworkers approached [] Sloan and said they were concerned about a negative change in the office dynamic due to [p]laintiff's rudeness, immaturity, and

---

[4]  Plaintiff responded to paragraph 34 of defendant's opposing statement of facts by "admit[ing] that her Quarter 2 evaluation contains a statement to the effect of Paragraph 34."  (Pl. Stmt. (DE 60) ¶ 34).  Plaintiff responds to additional paragraphs in defendant's opposing statement of facts in an identical fashion.  (See, e.g., id. ¶¶ 34-36, 38-39, 41, 88).  Where such responses do not "specifically controvert[]" these paragraphs of defendant's opposing statement of facts, these paragraphs are "deemed admitted for purposes of the motion." Local Civ. R. 56.1(a)(2).  The same is true where plaintiff additionally "denies that the facts" in opposing statement are "material," without more. (See, e.g., Pl. Stmt. (DE 60) ¶¶ 61, 64-67, 69-71, 73-74, 86).

6

propensity to complain about her fellow agents to groups outside of the Raleigh [f]ield [o]ffice," (id. ¶ 36);

4. "[Sloan] could not think of one example of [p]laintiff showing initiative or independently developing leads or cases," (id. ¶ 38);

5. "Plaintiff was resistant to criticism, and when [] Sloan would correct her work, she would complain about it or blame a coworker for her failures," (id. ¶ 39);

6. "Plaintiff had inappropriately used her husband, an agent in the Fayetteville [f]ield [o]ffice, to help her transport a prisoner instead of contacting [] Sloan or her fellow agents for assistance," (id. ¶ 40);

7. "[O]f the last 14 reports of investigation submitted by [p]laintiff, eight were submitted late without an extension authorized by [] Sloan," (id. ¶ 41);

8. "Plaintiff reported to operations without wearing her ATF-issued uniform," (id. ¶ 42).

In the remaining performance element, "Integrity," Sloan rated plaintiff as "Acceptable" "despite an incident in which [p]laintiff inaccurately noted in her management log that [] Sloan had authorized late reports when in fact, [] Sloan had not given any such authorization." (Id. ¶ 44). "Sloan noted that it was yet another example of something that could have easily been cleared up if she would simply communicate with him and her [instructor]." (Id.).

Plaintiff met with Sloan, Babits, and Avant on May 5, 2017, to discuss her second quarter evaluation. Sloan thereafter contacted Diaz and "described [p]laintiff's conduct in the two-hour . . . meeting as 'disrespectful, unprofessional, and defiant.'" (Id. ¶ 47). "Sloan reported that [p]laintiff affected the tone of a defense attorney . . . and attempted to cross-examine him." (Id. ¶ 48). He additionally reported that "[p]laintiff disagreed with every one of [] Sloan's critiques and

refused to accept any responsibility for her poor performance." (Id. ¶ 49). Sloan told Diaz that during the meeting "he asked [p]laintiff if she and [] Hyman had discussed performance expectations during their meeting on April 12, 2017, and [p]laintiff claimed that [] Hyman never spoke to her regarding those topics." (Id. ¶ 50).

Diaz thereafter reported to Hyman plaintiff's behavior during the May 5, 2017, meeting. (Id. ¶ 51). "In a May 12, 2017 email, [] Hyman responded to [] Diaz's report and stated that he had reviewed [p]laintiff's negative evaluation and that he was aware that [] Diaz and [] Sloan had discussed [p]laintiff's performance and attitude numerous times." (Id. ¶ 52). Hyman additionally wrote, "[a]s I have repeatedly said, I expect all of us to do everything that we can to support [plaintiff] and to ensure she becomes [an] outstanding [special agent] and productive and contributing member of [our office]." (Id. ¶ 53). He, however, expressed concern that plaintiff approached "the meeting as if she was an attorney and [Sloan was] the defendant and that she then began to ask you questions." (Id. ¶ 54). He provided that "[i]f this is accurate, [he] believe[d] [it] was totally inappropriate." (Id.). Hyman "requested feedback about the cross-examination incident from [] Avant and [] Babits," plaintiff's OJT Trainers who were also present at the May 5, 2017, meeting, and "suggested that the agency meet with [p]laintiff about her progress in training if necessary." (Id. ¶ 55). Hyman concluded his email by stating he "expect[ed] [plaintiff] to be receptive to advice and constructive criticism during this process and to be willing to make changes to her work performance and attitude when these have been brought to her attention." (Id. ¶ 56).

 "Hyman considered termination to be a last resort that would only be appropriate if [p]laintiff did not improve her performance by the end of the [third quarter]." (Id. ¶ 57). "Hyman

8

was particularly concerned because ATF had invested significant resources in recruiting [p]laintiff, funding her enrollment at the ATF National Academy, and training her when she came on board as a special agent; and terminating her would result in the loss of those significant investments." (Id.).

Plaintiff's third quarter evaluation "covered the time period of April 1, 2017 to June 30, 2017." (Id. ¶ 58). "Sloan signed [p]laintiff's [third quarter] evaluation on June 30, 2017, rated [p]laintiff as 'Unacceptable' in all six critical performance elements, and cited numerous incidents" in support. (Id. ¶ 59). Specifically, Sloan reported:

1. "Plaintiff drove her personal vehicle to an ATF operation where a confidential informant was present" and which operation "involved a narcotics purchase from a convicted felon and gang member," (id. ¶¶ 60-61);

2. When questioned what plaintiff would do "if the operation 'went bad,'" she responded that she "would have 'backed out of the situation,' which, as [] Sloan explained, 'raised grave concerns regarding her safety as well as the safety of all other participants in the operation,'" (id. ¶ 63);

3. According to another trainee, Jeter, who is black, plaintiff told Jeter she was "having more success and gets along with all other coworkers because [Jeter] is 'black' and everyone is 'afraid' of [Jeter]," (id. ¶ 64);

4. Jeter testified that plaintiff's "exact words were, '[t]hey only treat you good because you're a [b]lack female and they're afraid of you. They're afraid that you'll file an EEO complaint on them,'" (id. ¶ 65);

9

5. "ATF management encouraged [p]laintiff to reach out to coworkers who felt slighted or mistreated by [plaintiff], but she did not do so," (id. ¶ 66);

6. "Babits emailed [p]laintiff and urged her to volunteer for an assignment, which could demonstrate that [plaintiff] was a team player, but [plaintiff] did not even respond to the email," (id. ¶ 67);

7. Plaintiff's conduct during the May 5, 2017, meeting regarding plaintiff's second quarter evaluation, (id. ¶ 68);

8. Sloan "had discovered more late assignments from [the first quarter] that [p]laintiff had backdated in an attempt to conceal missed deadlines," (id. ¶ 69);

9. "Plaintiff told [Sloan] that she did not speak with [] Hyman on April 12, 2017, about his expectations of her, which was false," (id. ¶ 70);

10. "Plaintiff included her travel time to and from the office and her lunch break as part of her official workday," (id. ¶ 71);

11. "Sloan stated that [p]laintiff had spent most of her time in the previous four months working on a Hobbs Act Robbery case that only had one defendant; and several of her 'Recommendations for Prosecution' were for simple cases," (id. ¶ 73);

12. "[W]hen a coworker asked [p]laintiff why she would argue with [] Sloan when he requested that she dress professionally, [p]laintiff replied that she was not going to let management 'mess' with her," (id. ¶ 74);

13. Plaintiff recalled a conversation with Jeter in which "it was 'very possible' that she said she was not going to 'kiss [Sloan's] ass,'" (id. ¶¶ 75-76);

10

Hyman reviewed plaintiff's third quarter evaluation. (Id. ¶ 77). "On July 19, 2017, [] Hyman consulted with his direct supervisor . . . and ATF counsel" separately, inquiring who the final decision maker was with respect to whether [p]laintiff would be terminated." (Id. ¶ 79). Both confirmed it was "Hyman's decision alone to make," and "Hyman decided to fire [p]laintiff at that point." (Id.).

In the interim, "[o]n June 9, 2017, [p]laintiff anonymously suggested to. . . the ATF Atlanta [r]egional [c]omplaints [m]anager, that she might bring an EEO complaint." (Id. ¶ 78). Hyman became aware of plaintiff's complaint on July 25, 2017, and ultimately reviewed the complaint's contents after July 27, 2017. (Def. Stmt. (DE 47) ¶ 82). "Diaz did not learn about Plaintiff's EEO activity until October 23, 2017. (Id. ¶ 83).[5]

"On July 26, 2017, [] Hyman and [] Diaz gave [p]laintiff her termination letter." (Id. ¶ 85). "Hyman, who signed [p]laintiff's termination letter, wrote: 'You have served as a [c]riminal [i]nvestigator since November 17, 2015 and since that time you have had multiple instances of unacceptable behavior and poor performance.'" (Id. ¶ 86). Hyman included a timeline of plaintiff's conduct and performance and "described the conduct and performance issues [] Sloan had provided with his [second quarter] and [third quarter] evaluations." (Id. ¶¶ 87-88).

"After Plaintiff unsuccessfully brought her formal complaint to the agency, she litigated her claim before the Equal Employment Opportunity Commission, and her claim was denied." (Id. ¶ 89).

---

[5]    The record contains conflicting evidence as to when Sloan became aware of that complaint. (Compare Sloan Decl. Attachment 2 (DE 51-4) (email to Sloan from the complaints manager with plaintiff's informal EEO complaint dated July 25, 2017), with Sloan Decl. Exhibit B (DE 51-9) at 3 (complaint manager's summary of informal resolution attempts stating he contacted Sloan about the allegations June 9, 2017). Accordingly, the court presumes for purposes of the motion that Sloan became aware of the complaint on June 9, 2017.

Additional facts pertinent to the instant motion will be discussed below.

## COURT'S DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[6]  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary

---

[6]        Internal citations and quotation marks are omitted from all citations unless otherwise specified.

12

judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.      Analysis

     1.      Title VII Discrimination

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a). "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

        a.      Job Performance

"[I]f a plaintiff is able to produce direct evidence of discrimination, [s]he may prevail without proving all the elements of a prima facie case." McCleary-Evans v. Maryland Dep't of

Transp., State Highway Admin., 780 F.3d 582, 584-85 (4th Cir. 2015). "Absent direct evidence, the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010). The "satisfactory job performance" prong requires that plaintiff show "she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action." Bonds v. Leavitt, 629 F.3d 369, 386 (4th Cir. 2011).

"In determining whether an employee was performing at a level that met the employer's legitimate expectations, it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003). Likewise, testimony of co-workers that plaintiff's work met expectations is insufficient to create a genuine issue of material fact. Id.; Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir. 2000). However, Title VII "does not require the plaintiff to show that [s]he was a perfect or model employee." Haynes v. Waste Connections, Inc., 922 F.3d 219, 225 (4th Cir. 2019) (finding a genuine issue of material fact where employee received bonuses for the period in question and was told weeks before his termination that the employee had "nothing to worry about" regarding his performance review).

In certain cases, there may be "no one event that sparked the termination, but instead a long string of performance problems leading up to firing." Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 516 (4th Cir. 2006). In those instances, performance evaluations for years prior to plaintiff's termination may be insufficient to make prima facie showing of satisfactory job performance. See

14

O'Connor v. Consol. Coin Caterers Corp., 84 F.3d 718, 719-20 (4th Cir. 1996) (citing O'Connor v. Consol. Coin Caterers Corp., 56 F.3d 542, 547 (4th Cir. 1995) (holding that a review of an employee's 1989 performance was irrelevant to a determination of whether his performance was satisfactory at the time of his termination in August of 1990)).

It is undisputed that plaintiff repeatedly dressed in contravention of the ATF dress code policy as communicated to plaintiff by May 17, 2016, email. (Def. Stmt. (DE 47) ¶¶ 4-5; see also ATF Dress Code Policy (DE 51-14)). That policy requires agents such as plaintiff to wear "business attire" including "suits, pants, jackets, shirts, skirts and dresses that are appropriate for a business environment" and expressly forbids "jeans (regardless of color and/or pattern), t-shirts, sweat suits, shirts without collars, and footwear such as flip flops and sneakers." (Def. Stmt. (DE 47) ¶¶ 4-5). Plaintiff nevertheless persistently dressed in tennis shoes, jeans, t-shirts, and sweatshirts, despite multiple reminders to dress in accordance with dress code policy. (See Def. Stmt. (DE 47) ¶¶ 8-11, 18-19, 15-17). Plaintiff indeed testified that when she and her husband, also an ATF agent, wore sneakers to a training and her first-level supervisor, Sloan, tried to speak with them, they both "blew the comment off and did not respond." (Id. ¶ 10). Further, "when a co-worker asked [p]laintiff why she would argue with [] Sloan when he requested that she dress professionally, [p]laintiff replied that she was not going to let management 'mess' with her." (Id. ¶ 10).

The record also reflects additional instances of plaintiff's impertinence to supervisors, as reported by them. Sloan described plaintiff's conduct during their May 5, 2017, meeting to discuss her second quarter evaluation as "disrespectful, unprofessional, and defiant." (Id. ¶ 47). "Sloan reported that [p]laintiff affected the tone of a defense attorney . . . and attempted to cross-examine

15

him," which Hyman, plaintiff's third-level supervisor, described as "totally inappropriate." (Id. ¶¶ 48, 54). Plaintiff's training agents, Babits and Avant, who were also present at the meeting, described their discomfort throughout. Babits testified that plaintiff was "insubordinate, she rolled her eyes" and spoke over Sloan. (Babits Dep. (DE 61-4) 17:22-23, 18:3). Avant testified that had he been plaintiff's supervisor during the meeting, he "would have probably gotten up and gone and called [Hyman] and complained. Because from the minute [they] sat down, it was like [Sloan] was on trial." (Avant Dep. (DE 61-3) 35:2-5). Avant described plaintiff's conduct as "insubordinate[e]" and "purely disrespect[ful]," and on reflection testified that he "probably should have got[ten] up and walked out." (Id. 35:13-14, 36:15). He stated he had "never been that uncomfortable in [his] life in any meeting, in any interview, in any interrogation, when [he] got in trouble at school or anywhere. [He'd] never been that uncomfortable in [his] life." (Id. 36:16-19).

There is also uncontroverted evidence of dishonest or otherwise fraudulent conduct by plaintiff. For instance, in that same May 5, 2017, meeting, "[p]laintiff told [Sloan] that she did not speak with [] Hyman on April 12, 2017, about his expectations of her, which," undisputed by plaintiff, "was false." (Def. Stmt. (DE 47) ¶ 70). Babits testified that upon hearing plaintiff's denial of having discussed with Hyman his expectations of her, Babits "jaw dropped" because he "was in that meeting [between plaintiff and Hyman] and that's exactly what [Hyman] had [done]." (Babits Dep. (DE 61-4) 32:16-21) (describing plaintiff's statement as "a lie"). Sloan additionally noted in plaintiff's second quarter evaluation that, though he rated plaintiff as "Acceptable" in the performance element of "Integrity," plaintiff "inaccurately noted in her management log that [] Sloan had authorized late reports when in fact, [] Sloan had not given any such authorization." (Def. Stmt. (DE 47) ¶ 44). Finally, Sloan noted he "had discovered more late assignments from

16

[first quarter] that [p]laintiff had backdated in an attempt to conceal missed deadlines," and that she "included her travel time to and from the office and her lunch break as part of her official workday." (Id. ¶¶ 69, 71).

Sloan also noted in plaintiff's second quarter evaluation that plaintiff's "coworkers approached [him] and said they were concerned about a negative change in the office dynamic due to [p]laintiff's rudeness, immaturity, and propensity to complain about her fellow agents to groups outside of the Raleigh [f]ield [o]ffice." (Id. ¶ 36). Additionally, another trainee, Jeter, reported that plaintiff told her Jeter was "having more success and gets along with all other coworkers because she is 'black' and everyone is 'afraid' of her." (Id. ¶ 64). Jeter testified that plaintiff's exact words were "[t]hey only treat you good because you're a [b]lack female and they're afraid of you. They're afraid that you'll file an EEO complaint on them." (Jeter Dep. (DE 52-7) 5:30-31, 6:1).

There is also evidence in the record that plaintiff's conduct during field operations created security risks for herself and other officers. For instance, Sloan reported in plaintiff's second quarter evaluation that "[p]laintiff drove her personal vehicle to an ATF operation where a confidential informant was present" and which operation "involved a narcotics purchase from a convicted felon and gang member." (Def. Stmt. (DE 47) ¶¶ 60-61). Babits testified that driving a personal vehicle presented an "operational security risk" as confidential informants "are criminals. And we don't want them, you know, writing down our plates or even saying hey, ATF has, you know, these type of cars, guys, and putting that word out on the street" which in turn could make them a "target." (Babits Dep. (DE 61-4) 44:6-15).

Plaintiff additionally responded when questioned that, while acting as "cover" for agents, "if the operation 'went bad,'" she "would have 'backed out of the situation.'" (Def. Stmt. (DE 47) ¶ 63). A "cover" is responsible for securing the outside perimeter during an operation. (See Avant Dep. (DE 61-3) 19:19-25, 20:1-1). Both Babits and Avant testified that they had confirmed with plaintiff that she was comfortable doing cover while pregnant, (id. 20:3-6; Babits Dep. (DE 61-4) 20:5-10, 40:9-13), and upon later hearing that plaintiff would have "backed out" of the operation, believed plaintiff's conduct raised grave security concerns. Avant testified that hearing plaintiff "would have gone the other way" if something "bad" happened "made [him] feel unsafe if she was covering [his] back" and like he "wouldn't trust her" or "want her on any [operations] that [he] went on." (Avant Dep. (DE 61-3) 20:13-18). Babits similarly testified that if he had known "she would have backed of a situation, putting [his] life and all the other guys' lives in danger, [he] would not have put her on [an] operation." (Babits Dep. (DE 61-4) 20:5-10). Babits provided that he felt "[m]ad, upset, disappointed. And . . . was shocked . . . that [ATF] had an agent that would have backed out of a situation if things happened." (Babits Dep. (DE 61-4) 45:7-9).

Sloan additionally reported that plaintiff failed to "show[] initiative or independently develop[] leads or cases." (Def. Stmt. (DE 47) ¶ 38). For instance, on one occasion Babits "urged [plaintiff] to volunteer for an assignment, which could demonstrate that she was a team player, but [plaintiff] did not even respond to the email." (Id. ¶ 67). Sloan also reported in plaintiff's second quarter evaluation that "of the last 14 reports of investigation submitted by [p]laintiff, eight were submitted late." (Id. ¶ 41).

Citing the foregoing, Sloan ranked plaintiff as "Unacceptable" in five out of six critical performance elements in her second quarter evaluation and as "Unacceptable" in all six critical

18

performance elements in her third quarter evaluation. (Id. ¶¶ 33, 59). It is thus undisputed that plaintiff was not meeting her employer's expectations at the time of her termination.

In arguing that she was in fact meeting defendant's expectations, plaintiff notes that though her second and third quarterly reviews were negative, her monthly reports from Avant and Babits, her training officers, were uniformly positive. Babits, however, testified that those reports merely include "what the trainee has done during the month" such as "how many reports they've written [and] how many hearings they went to. There are a certain amount of those blocks that need to be checked. . . . [a]nd that's what those monthly reports . . . are for." (Babits Dep. (DE 61-4) 28:2-11). He explained that when conduct did not fit into one of those "boxes," even if reported to him, he did not include it within the monthly report. For instance, though Jeter reported to Babits plaintiff's comment attributing Jeter's success to her being a black woman, and though Babits "was very upset" by the comment, he did not mention it in that month's report because it did not fit within on the of the "block[s] to check." (Id. 38:12-16, 39:11-22, 40:3-5). Similarly, when an industry operation investigator reported to Babits that plaintiff declined to interact with ATF personnel at a gathering and to meet with the head of the operations for the division, Babits told her to go to Sloan "because that wasn't a block to check on [his] monthly eval[uation]." (Id. 38:18-25, 39:1-10.

The monthly reports accordingly did not provide a complete picture of plaintiff's performance. Indeed, despite their positive monthly reports, both training officers testified to plaintiff's shortcomings in the months preceding her termination. For instance, as noted above, both described her conduct during the May 5, 2017, meeting with Sloan to discuss her second quarter evaluation as insubordinate. They also testified that they would not trust her on operations

19

after she revealed that she would "back out" if the situation went "bad." (Id. 17:22-23, 18:3, 20:5-10, 45:7-9; Avant Dep. (DE 61-3) 20:13-18, 35:2-5, 13-14, 36:15). Avant additionally testified plaintiff was repeatedly tardy and did not complete her management logs or reports "in the time frame required." (Avant Dep. (DE 61-3) 9:19-23).

Plaintiff also contends that her first quarterly review, signed by Sloan, was "entirely positive." (Pl. Resp. (DE 59) at 4). Plaintiff's termination, however, was overwhelmingly based on her conduct during the second and third quarter. (See generally Notification of Termination (DE 53-1)). She cannot rely on one satisfactory performance evaluation outside of that time frame to create a genuine issue of material fact as to whether she was performing to defendant's legitimate expectations at the time of her termination. See Warch, 435 F.3d at 518 ("Faced with such abundant evidence, Warch cannot create a genuine dispute concerning his prima facie case by cherry-picking the record to find one isolated instance where he arguably performed better than the average employee."). Further, Sloan belatedly discovered during the third quarter that plaintiff turned in late assignments from the first quarter and backdated them in an attempt to conceal the missed deadlines. (Def. Stmt. (DE 47) ¶ 69).

Relatedly, plaintiff also asserts Sloan "told her that he had no issues with her performance in their meeting on January 31, 2017, when [plaintiff] told him that she was pregnant." (Pl. Resp. (DE 59) at 4). "This evidence, even if true, is simply not enough to genuinely dispute the considerable evidence of [plaintiff's] repeated failures and negative performance." Warch, 435 F.3d at 518. Particularly given that most of that evidence of failure arose during the second and third quarter, which covered a period largely after Sloan purportedly made that comment, from January 1, 2017, to June 30, 2017. Finally, plaintiff points to the deposition of Chamberlain, a

task force officer with ATF with whom plaintiff worked. She argues that his testimony demonstrates her "competence and performance." (Pl. Resp. (DE 59) at 4). However, as "it is the perception of the decision maker which is relevant" "[i]n determining whether an employee was performing at a level that met the employer's legitimate expectations," plaintiff cannot create a genuine issue of material fact by pointing to evidence that her co-worker thought she was performing well. King, 328 F.3d at 149.

In sum, plaintiff does not make a prima facie showing of satisfactory job performance, and thus cannot make a claim of discriminatory treatment.

        b.       Pretext

In addition, and in the alternative, plaintiff fails to carry her burden of showing defendant's legitimate, nondiscriminatory reasons for plaintiff's negative performance reviews and termination were pretextual.

If plaintiff makes a prima facie showing of sex discrimination, the burden shifts to defendant to produce evidence of a "legitimate, nondiscriminatory reason" for the adverse employment actions. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981); Guessous v. Fairview Prop. Investments, LLC, 828 F.3d 208, 217 (4th Cir. 2016). "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [actions]." Burdine, 450 U.S. at 255. "The explanation provided must be legally sufficient to justify a judgment for the defendant." Id. For instance, "[j]ob performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996). "The defendant need not persuade the court that it was actually motivated by the

proffered reasons." Burdine, 450 U.S. at 254. Rather, "to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Id. at 257. In the absence of such explanation, "a finding of the . . . the prima facie case[] produces a required conclusion . . . of unlawful discrimination." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

"If the defendant carries this burden of production, [however,] the presumption raised by the prima facie case is rebutted and drops from the case." Hicks, 509 U.S. at 507. "The plaintiff then has the full and fair opportunity to demonstrate . . . that the proffered reason was not the true reason for the employment decision and that [sex] was." Id. at 507-08. Ultimately, plaintiff has the burden of proving "both that the reason was false, and that discrimination was the real reason for the challenged conduct." Jiminez v. Mary Washington Coll., 57 F.3d 369, 378 (4th Cir. 1995) (emphasis in original); see Hicks, 509 U.S. at 511 ("The defendant's production (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven that the defendant intentionally discriminated against [her] because of [her] [sex].").

In considering whether the plaintiff has demonstrated pretext, "it is not [the court's] province to decide whether the reason [proffered] was wise, fair, or even correct, ultimately, so long as it truly was the reason for [the adverse action]." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000). "[T]he plaintiff cannot seek to expose [defendant's] rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." Hux v. City of Newport News, Va., 451 F.3d 311,

315 (4th Cir. 2006). "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 295 (4th Cir. 2010).

Defendant offers numerous legitimate, nondiscriminatory reasons for plaintiff's termination including: plaintiff's repeated violations of the dress code, insubordination, dishonesty, disharmonious and even racialized conduct towards co-workers, creation of security risks for herself and other officers during field operations, lack of initiative, and untimeliness of reports. Those reasons are grounded in the particular instances of poor performance discussed by the court more fully above.

The evidence presented by plaintiff fails to raise a genuine issue of material fact as to pretext. In addition to plaintiff's arguments already addressed above with respect to the prima facie case, and with regard to alleged violations of the dress code, plaintiff contends that her shoes and attire were "consistent with [plaintiff's] training and observation of what others in the office wore." (Pl. Resp. (DE 59) at 5). In support, plaintiff cites to Avant's testimony that he "regularly wore jeans and gym shoes and could not remember if it was a part of any of his evaluations." (Pl. Stmt. (DE 60) ¶ 42). In fact, however, Avant testified that while he personally "never had a problem of gym shoes," Sloan had spoken with him "about [his] gym shoes and [his] wearing blue jeans on numerous occasions." (Avant Dep. (DE 61-3) 23:12-16). Eventually, those conversations "made [him] yield" and he began wearing more professional attire. (Id. 23:20). Avant also testified that he himself had "talked to [plaintiff] about her dress . . . on more than one occasion." (Id. 24:18-19). Further, while Avant could not remember if his attire was mentioned in his evaluations, he testified he "hardly ever read[s] [his] evaluations. . . . So if it was in there, [he]

23

probably missed it." (Id. 24:23-25). Avant's testimony thus does not call into question the genuineness of defendant's proffered reasons for plaintiff termination.

Plaintiff also argues that while defendant cited, in addition to the performance issues outlined above, concern regarding plaintiff's failure to wear body armor and lack of access to a firearm during an operation, "there is testimony that [plaintiff] did not actually violate [d]efendant's policies." (Pl. Resp. (DE 59) at 6). First, even assuming such a discrepancy, it is minor in light of plaintiff's other shortcomings and thus alone insufficient to cast doubt on defendant's explanation. See Hux, 451 F.3d at 315. Further, the testimony to which plaintiff cites, Sloan's testimony, does not establish a discrepancy. Sloan testified that he did not "recall if the policy says you must wear [body armor] on every operation," but his "recollection [was] you have to have it available." (Sloan Dep. (DE 61-7) 23:18-22). He clarified that "[t]here is a body armor policy, [he] just [didn't] remember." (Id. 23:22-23). Such expression of uncertainty is inadequate to meaningfully cast doubt on the genuineness of defendant's explanation.

Plaintiff additionally contends that in the April 12, 2017, meeting she had with Hyman and Babits, Hyman told her he "expected [plaintiff] to be the first one in the office in the morning and the last one to leave and that [her] supervisor should be telling [her] to go home every night. [She] should be volunteering for everything to help other people out and that [she] shouldn't use pregnancy as an excuse." (Pl. Stmt. (DE 60) ¶ 60). Babits, however, testified that he did not recall Hyman telling plaintiff not to us her pregnancy as an excuse. (Babits Dep. (DE 61-4) 32:4-6). Further, it is undisputed that "Hyman considered termination to be a last resort that would only be appropriate if [p]laintiff did not improve her performance by the end of the [third quarter]." (Def. Stmt. (DE 47) ¶ 57). It is also undisputed that following the April 12, 2017, meeting Hyman

emailed plaintiff's supervisors after reading her negative second quarterly report and wrote: "As I have repeatedly said, I expect all of us to do everything that we can to support [special agent] Johnson and to ensure she becomes [an] outstanding [special agent] and productive and contributing member of [our office]." (Id. ¶ 53). Hyman explained that he "was particularly concerned because ATF had invested significant resources in recruiting [p]laintiff, funding her enrollment at the ATF National Academy, and training her when she came on board as a special agent; and terminating her would result in the loss of those significant investments." (Id. ¶ 57). With those facts undisputed, to nevertheless conclude Hyman discriminated against plaintiff based on her sex because of one stray and disputed comment would be an inference based upon "speculation and conjecture." Lovelace, 681 F.2d at 241.

Finally, plaintiff notes that the Durham police department has a policy for pregnant women to be excused from field operations during pregnancy, while ATF's Raleigh office does not. (Pl. Stmt. (DE 60) ¶ 63). Where plaintiff has not demonstrated any connection between those offices, particularly whether the Durham police department is under the jurisdiction of ATF, the policies of the Durham police department are "wholly irrelevant." Hux, 451 F.3d at 315.

Accordingly, the court grants summary judgment to defendant on plaintiff's Title VII discrimination claim.

2.     Title VII Retaliation

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). "The

25

elements of a prima facie retaliation claim under Title VII are: (1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." Coleman, 626 F.3d at 190. "An employee may establish prima facie causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." Strothers v. City of Laurel, Maryland, 895 F.3d 317, 335-36 (4th Cir. 2018).

"[W]hen a plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action." E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 407 (4th Cir. 2005). "If the defendant carries this burden, the presumption of retaliation falls, and the plaintiff bears the ultimate burden of proving that the defendant's non-retaliatory reason for the adverse employment action was pretextual." Id. To carry her burden at the pretext stage, "a plaintiff making a retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013).

Protected activity cannot be a "but for" cause of an adverse action by an employer if the relevant decisionmaker did not know of the protected activity when taking the adverse action. See Holland, 487 F.3d at 218. Indeed, even "mere knowledge on the part of an employer that an employee . . . has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons' for adverse personnel action against that employee." Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994).

26

The court assumes without deciding that plaintiff has made a prima facie case of retaliation. The court also assumes without deciding that plaintiff engaged in protected activity: (1) on January 31, 2017, when she allegedly told Sloan she was pregnant and felt he was treating her differently than her coworkers; (2) on May 5, 2017, when she accused Sloan of treating her differently than her coworkers during her meeting to discuss her second quarter evaluation; (3) on June 9, 2017, when she initiated contact with an EEO counselor to discuss possibly bringing an EEO complaint; and (4) on June 18, 2017, when she told an EEO counselor that she wanted to file an EEO complaint. Finally, the court assumes that Sloan was aware that plaintiff had consulted the ATF regional complaints manager prior to signing her third quarter evaluation, a fact that is in dispute.

With all those assumptions made, as the court has already explained in detail the record nevertheless reflects that defendant's reviews of plaintiff and the decision to terminate plaintiff were based on numerous legitimate considerations "which reflected neither discrimination or retaliation in the employment context." Hux, 451 F.3d at 319 n.2. Plaintiff has not shown that these reasons were a pretext for retaliation.

In support of her argument of pretext, plaintiff contends that during her January 31, 2017, meeting with Sloan, during which plaintiff told Sloan she was pregnant, Sloan expressed concern that plaintiff would make an EEO complaint against him. She further asserts Sloan later repeated those concerns to Jeter. Jeter, however, testified that Sloan never made such comments to her, and indeed Sloan and she "never discussed [plaintiff]s pregnancy or details about her work performance." (Jeter Aff. (DE 52-7) 4:20-29, 5:1-3, 8:1-6). Thus, the only evidence plaintiff offers in support of such comments having been made is her own testimony, which alone is "insufficient to counter substantial evidence of legitimate non[retaliatory] reasons" for a

27

discharge." <u>Dockins v. Benchmark Commc'ns</u>, 176 F.3d 745, 749 (4th Cir. 1999). Particularly where, as here plaintiff's termination occurred months after Sloan allegedly made such comment, and where the decision to terminate plaintiff ultimately was made not by Sloan, but by Hyman, who alone had "the sole authority to terminate [her]." (Def. Stmt. (DE 47) ¶ 84). Hyman, for his part, was not made aware of plaintiff's EEO complaint until after he terminated her. (<u>Id.</u> ¶ 82).

In sum, defendant has presented substantial evidence that plaintiff's repeated violations of ATF policies and the tardiness of submissions, coupled with perceived unprofessional, antisocial and insubordinate conduct, were the reasons for her termination. On such facts, plaintiff fails to show her complaints were the "but for" cause of the adverse actions taken against her. Accordingly, summary judgment is granted to defendant on plaintiff's Title VII retaliation claim.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment (DE 45) is GRANTED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 30th day of August, 2022.

LOUISE W. FLANAGAN
United States District Judge